## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| THOMAS E. TUGGLE II, | ) | |
| | ) | Case No.: 4:20-cv-00321 |
| INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) | |
| | ) | |
| *Plaintiff*, | ) | ***JURY TRIAL DEMANDED*** |
| | ) | |
| v. | ) | |
| | ) | |
| WELLS FARGO HOME MORTGAGE and WELLS FARGO, N.A. | ) ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Thomas E. Tuggle II ("Plaintiff"), by and through his undersigned counsel, brings this Class Action Complaint ("Complaint") on behalf of himself and all others similarly situated against Defendants Wells Fargo Home Mortgage, Inc. ("Wells Fargo Home Mortgage") and Wells Fargo Bank, N.A. ("Wells Fargo Bank," and together with Wells Fargo Home Mortgage, "Wells Fargo").

## NATURE OF THE ACTION

1.      Wells Fargo is one of the country's largest mortgage lenders.  This lawsuit concerns its portfolio of residential mortgages insured by the Federal Housing Administration ("FHA").

2.      Wells Fargo has originated hundreds of thousands, if not millions, of FHA-backed residential loans since 2001.

1

3.    The FHA is entirely self-funded by the mortgage insurance premiums (defined *infra* as "MIP") it collects from borrowers, including both up-front premiums collected in advance of the loan closing and monthly premiums collected during the pendency of the loan.

4.    The borrower does not remit these monthly MIP payments to the FHA. Rather, the FHA determines the amount of premium that each borrower owes and communicates that information to his or her lender on a monthly basis. The lender collects that amount from the borrower as part of his or her overall monthly payment obligation and then remits the MIP portion of that payment to the FHA on the borrower's behalf.

5.    The length of time for which the FHA requires monthly MIP payments varies depending on the type of loan and the date it was issued. Once the requisite number of payments have been made, the FHA will <u>automatically</u> stop assessing mortgage insurance against the borrower's account, or "case number." After that occurs the lender is no longer permitted to collect MIP payments from the borrower.

6.    As set forth in more detail below, Wells Fargo recently disclosed a "systemic" issue whereby it improperly collected monthly MIP payments from borrowers for months or even years after the FHA had already canceled the monthly MIP payment obligation.

7.    In at least one instance Wells Fargo attempted to quietly pay-off one of the victims of its misdeeds—an individual who made 41 unnecessary additional monthly MIP payments—without any explanation whatsoever as to why Wells Fargo continued to overcharge him month after month after month for nearly 4 years.

8.    When the victim sought additional information about the overcharges, he also learned that Wells Fargo had held the overpaid funds (totaling thousands of dollars) for more than two years before attempting to refund them. In other words, Wells Fargo collected 41 months'

worth of overpayments, then held those overpayments for an additional 2 years—earning interest and increasing its base of operating capital all along the way.

9.     Wells Fargo's concealment of its admittedly "systemic issue" and subsequent refusals to provide the victim with an explanation for the overpayments or why it held the funds for so long suggests that Wells Fargo wishes to keep this issue secret to continue exploiting its customers.

10.     Indeed, it appears that Wells Fargo's standard practice is or was to collect monthly MIP payments, even where FHA has ceased requiring them, until the borrower contacts Wells Fargo to request removal.  This is contrary to federal law governing the assessment of MIP, and is also in breach of the mortgage agreement between Wells Fargo and the borrower.

11.     Wells Fargo's mishandling of MIP payments is the latest in a long line of missteps plaguing its residential mortgage portfolio.  In the last ten years alone Wells Fargo has found itself in hot water for improperly certifying borrower eligibility to the federal government[1], forcing borrowers to purchase insurance at inflated premiums[2], overcharging customers for appraisals[3], and altering borrower payment schedules without consent.[4]  All the while Wells Fargo continues to enjoy record profits, and even spent $70 billion on share repurchases over this same time period.[5]

---

[1]     https://www.justice.gov/opa/pr/wells-fargo-bank-agrees-pay-12-billion-improper-mortgage-lending-practices.

[2]     https://www.marketwatch.com/story/wells-fargo-agrees-to-settle-lawsuit-over-pricey-forced-insurance-1394121704.

[3]     https://www.latimes.com/business/la-fi-wells-fargo-settlement-20161102-story.html.

[4]     https://www.nbcnews.com/business/personal-finance/more-wells-fargo-customers-say-bank-decided-pause-their-mortgage-n1234610.

[5]     https://www.forbes.com/sites/greatspeculations/2019/07/05/feds-growth-restrictions-force-wells-fargo-to-loosen-its-purse-strings-for-investors-yet-again/#4061074521e2.

Wells Fargo's problem is not that it is "too big to fail"—the issue is, Wells Fargo is "too big to care."

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. § 1332(d)(2).  The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interests and costs, and the number of claimants exceeds 500 persons.

13.     This Court has personal jurisdiction over the Defendants, as both transact extensive business within this State and as such have purposely availed themselves of and established minimum contacts with the State.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants reside in, transact business in, are found within, and have agents in this District, and a substantial part of the events giving rise to Plaintiff's claims arose in this District.

## PARTIES

15.     Plaintiff Thomas E. Tuggle II is a Combat Decorated Marine Veteran and currently serves as a Lieutenant Colonel in the Mississippi Highway Patrol.  At all times mentioned herein Mr. Tuggle was an individual citizen of the State of Mississippi and currently resides in that State.

16.     Defendant Wells Fargo Home Mortgage, Inc. ("Wells Fargo Home Mortgage") is a California corporation with its principal place of business or "Home Office" located at 1 Home Campus, Des Moines, Iowa 50382.

17.     Defendant Wells Fargo Bank, N.A. ("Wells Fargo Bank") is a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota.

## FACTUAL ALLEGATIONS

I.    *Background:  The FHA Program and Collection of MIP*

18.    Congress created the Federal Housing Administration ("FHA") in 1934 for the purpose of making home ownership more accessible to the general public.  One of the ways the FHA effectuates this goal is by insuring mortgages issued by approved private lenders against the risk of default, thereby encouraging those lenders to make credit available to a wider range of borrowers.  The program has been very successful; the FHA currently has active insurance on over 8 million single family mortgages.[6]

19.    The FHA is entirely self-funded by the mortgage insurance premiums, referred to herein as "MIP," that FHA "collects from borrowers via lenders."[7]

20.    The Department of Housing and Urban Development ("HUD") promulgates specific rules governing the assessment of MIP, such as the dollar amount to be charged and the duration of the payment obligation.  These rules are published in a number of places, including but not limited to periodic "Handbooks" and/or "Mortgagee Letters" that HUD makes available to all participating FHA lenders.

21.    Most, if not all, FHA-backed loans require payment of a single up-front premium calculated on the basis of the initial principal amount of the loan.  The amount of this up-front premium varies depending on the particular loan product (*e.g.*, a new loan versus a refinance), the amount of the borrower's down payment, and the date of the loan.

22.    FHA also collects monthly MIP payments on most or all of the loans it insures.

[6] https://www.hud.gov/program_offices/housing/fhahistory.

[7] *Id.*

5

23.     The borrower does not make his or her monthly MIP payments directly to the FHA; instead, monthly MIP payments are included as part of the borrower's total monthly payment obligation to their lender, who then remits the MIP payment to the Single Family Insurance Operations Division of HUD's Office of Financial Services.

24.     Consistent therewith, FHA's standard "Deed of Trust," or "Mortgage," provides that the borrower's monthly MIP payments will be paid directly to the lender, who will then remit those payments to HUD.

25.     As with the up-front payments, the duration of a borrower's monthly MIP obligation varies based on the date and type of loan, the amount of the borrower's down payment, and outstanding principal amount.

26.     For example, monthly MIP payments on single-family home loans that closed after December 31, 2000 with an FHA "case number assignment" date before June 3, 2013 are automatically canceled once the balance on the loan is paid down to 78 percent of the appraised value of the home.  Other FHA products require MIP payments for 11 years, while some do not require any payments at all.

27.     FHA will stop assessing MIP charges to a borrower's account once the applicable conditions set forth by HUD have been satisfied—as HUD states, MIP is "automatically canceled" when that occurs.[8]

## II.     Mr. Tuggle's Experience

28.     Mr. Tuggle and his wife, Linda, are the owners of a parcel of real property located in Hernando, Mississippi (hereafter, the "Property").

---

[8] https://www.hud.gov/sites/dfiles/OCHCO/documents/4000.1hsgh.pdf.

29.     On September 21, 2007, Mr. and Mrs. Tuggle executed an FHA "Deed of Trust" in favor of Wells Fargo through which Mr. and Mrs. Tuggle agreed to pay Wells Fargo a specified sum of principal plus interest over a term of 30 years, with the debt secured by the Property.

30.     In or around April 2013, Mr. and Mrs. Tuggle submitted an application to refinance their existing FHA loan for the Property, with Wells Fargo continuing to serve as lender, via the FHA's "Streamline Refinance" program.  An FHA Case Number was assigned to Mr. and Mrs. Tuggle's refinance application around this time.

31.     Mr. and Mrs. Tuggle closed on their FHA refinance loan with Wells Fargo in July 2013.

32.     As part of that closing Mr. and Mrs. Tuggle executed another FHA "Deed of Trust" in favor of Wells Fargo setting forth the terms and conditions governing their refinance loan.  That loan was again secured by the Property.

33.     The amount and term of MIP payments is not set forth in the standard Deed of Trust form executed by Mr. and Mrs. Tuggle—rather, that form provides that the lender (*i.e.*, Wells Fargo) will collect monthly MIP payments to the extent required by HUD/FHA.

34.     Mr. and Mrs. Tuggle's FHA refinance loan was serviced by Wells Fargo.

35.     Wells Fargo collected monthly MIP payments from Mr. and Mrs. Tuggle as part of their overall monthly payment obligation, beginning with the first payment due on the loan in September 2013.

36.     Unbeknownst to Mr. and Mrs. Tuggle, the FHA terminated monthly MIP payments due on their loan as of January 2015.

37.     Wells Fargo continued to collect monthly MIP payments from Mr. and Mrs. Tuggle after the FHA had terminated the payment obligation.

38.    In July 2020, Wells Fargo sent a letter to Mr. and Mrs. Tuggle stating that Wells Fargo had overcharged them for monthly MIP payments ("Notification Letter").

39.    The Notification Letter disclosed that Wells Fargo had collected monthly MIP payments from Mr. and Mrs. Tuggle for 41 months after FHA had terminated the payment obligation, or until mid-2018.

40.    The Notification Letter enclosed a check purportedly intended to refund the MIP overpayments and further "compensate" Mr. and Mrs. Tuggle for the loss of their funds.

41.    In July 2020 Mr. Tuggle made multiple phone calls to Wells Fargo's customer service department to inquire about the facts and circumstances described in the Notification Letter.

42.    Mr. Tuggle's inquiries included, but were not limited to, why Wells Fargo had waited more than 2 years before disclosing the overpayments, let alone attempting to refund the amount owed.  Mr. Tuggle also asked how Wells Fargo had calculated the "compensation" it claimed it was offering.  He did not receive an answer to either of these questions.

43.    Mr. Tuggle also asked whether Wells Fargo had earned interest on the MIP overpayment amounts it had collected.  While Mr. Tuggle was told that Wells Fargo did not earn interest on the overpayments, Wells Fargo's website indicates that escrow accounts do in fact accrue interest, and that Wells Fargo only pays that interest to borrowers where state law so requires.[9]

44.    Mr. Tuggle was also told that the MIP overpayment issue was a "systemic" problem impacting other Wells Fargo borrowers.

---

[9] https://www.wellsfargo.com/mortgage/manage-account/escrow/faqs/.

45.    Mr. Tuggle was informed that the root cause of the overpayment issue is that FHA and Wells Fargo do not communicate effectively regarding the assessment of MIP as to Mr. Tuggle and others' accounts. However, Wells Fargo's website states it will collect MIP payments until the borrower contacts Wells Fargo and affirmatively requests that the MIP obligation be terminated.[10]

III.    *HUD/FHA Communicate Borrowers' MIP Obligations to Lenders in Multiple Ways*

46.    HUD/FHA calculate the MIP payment amount—if any—due on borrowers' accounts each month.[11]

47.    HUD/FHA have created multiple electronic interfaces through which MIP payment obligations are communicated to lenders:

- the "FHA Connection" portal provides lenders with direct access to HUD's systems.  This portal allows lenders to, *inter alia*, determine and remit monthly MIP premiums that may be due on any case in the lender's portfolio;[12]

- some lenders receive monthly bills for their active cases reflecting, *inter alia*, current MIP payments due, and any changes to the amount owed;[13]

- other lenders communicate with FHA through "batch file" transmissions that identify MIP information by FHA case number;[14] and

- HUD's Single Family Premium Collection Subsystem system tracks the collection of monthly mortgage insurance premiums and provides reports relating to monthly premiums for cases in a lender's portfolio.[15]

---

[10]    https://www.wellsfargo.com/mortgage/manage-account/insurance/mortgage-insurance/how-to-remove-mortgage-insurance/.

[11]    https://www.hud.gov/program_offices/housing/comp/premiums/sfovrvw.

[12]    https://entp.hud.gov/clas/faq-sfs.cfm.

[13]    https://www.hud.gov/program_offices/housing/comp/premiums/sfovrvw.

[14]    https://www.hud.gov/program_offices/housing/comp/premiums/sfbchinp.

[15]    https://www.hud.gov/program_offices/housing/comp/premiums/atgen.

48.     The "case status" files made available through FHA Connection and these other interfaces display a letter "T" when FHA has terminated MIP on a particular case.[16]

49.     In addition to the foregoing, FHA also provides a series of monthly reports to its lenders that provide individualized detail about MIP premiums for each account the lender services:

- "Billing Reports" provide lenders with the amount of premium, late charges, and interest owed on each case serviced by the lender for a particular billing period;

- "Reconciliation Reports" provide information about unreconciled cases from the previous billing period, including any MIP overpayments;

- "Lender Notification" reports disclose irregular results from the prior month's MIP payments—including where MIP payments have been made on a case that has not been billed.  FHA directs participating lenders to check their notification files twice a month to learn of any "unexpected events," such as payment on a case that has not been billed;[17] and

- Portfolio or Audit reports provide "critical FHA case information such as monthly [MIP] premium" for the FHA cases the lender is currently servicing.[18]

50.     Each of the foregoing resources reveal, on a monthly or more frequent basis, when HUD/FHA have automatically canceled MIP payments on a borrower's account.

51.     Lenders who utilize these tools to detect overpayments on a particular account may request refunds directly from FHA.[19]

---

[16] https://www.hud.gov/program_offices/housing/comp/premiums/atref.

[17] https://www.hud.gov/program_offices/housing/comp/premiums/sflend.

[18] https://www.hud.gov/program_offices/housing/comp/premiums/sfport.

[19] https://www.hud.gov/program_offices/housing/comp/premiums/atref

*IV.*    *Wells Fargo Continues to Collect MIP Even After HUD/FHA Have Terminated the Underlying Payment Obligation*

52.    HUD/FHA do not communicate directly with borrowers. They rely on lenders to convey MIP payment information to their respective borrowers—including when monthly MIP obligations have been terminated.

53.    Accordingly, it is imperative that lenders have adequate infrastructure in place for receiving and processing the monthly MIP information that HUD/FHA make available to them, and that they communicate that information to borrowers in a timely fashion.

54.    Wells Fargo either lacks this infrastructure or else ignores outright the monthly MIP payment information that HUD/FHA provide.

55.    In other words, it is Wells Fargo's practice to continue billing its FHA borrowers for MIP, even after the FHA stops billing Wells Fargo.

56.    Wells Fargo's practice is contrary to HUD/FHA policies and regulations stating that "MIP is automatically cancelled" when the relevant criteria for the particular loan are satisfied.[20]

57.    Wells Fargo's practice of billing borrowers for MIP even after the FHA has automatically canceled the MIP payment obligation violates the express terms of the form "Deed of Trust" or "Mortgage" that Wells Fargo enters into with each and every borrower on an FHA loan.

58.    Wells Fargo's practice also violates 24 CFR § 203.22, which permits lenders to collect mortgage insurance payments only for so long as the premiums are payable by the lender to the Commissioner.

---

[20] *See, e.g.*, https://www.hud.gov/sites/dfiles/OCHCO/documents/4000.1hsgh.pdf; https://www.hud.gov/sites/documents /4155-2_7.PDF.

V.    *Wells Fargo's Overcollections Have Caused Losses on a Massive Scale*

59.    The FHA program is wildly popular.  The FHA's most recent annual report reflects more than $1.2 trillion in outstanding principal balance on FHA's loans as of the end of 2019.[21]

60.    Wells Fargo is one of the largest FHA lenders in the world.

61.    Using 2013—the year Mr. and Mrs. Tuggle's FHA refinance loan closed—as a reference point reveals both the FHA's massive footprint and the extent of Wells Fargo's involvement with the program.

62.    The FHA insured more than 1.1 million loans worth over $204 billion in 2013.[22] Approximately 500,000 of those loans, totaling $87 billion, were for FHA refinances.

63.    According to the Wall Street Journal, Wells Fargo accounted for approximately 10 percent of these originations.[23]

64.    The WSJ's figure is corroborated by FHA's own data.  According to FHA's "Monthly Snapshot" reports, in just a two-month span in June and July 2013 (*i.e.* the two months preceding the closing of Mr. Tuggle's FHA refinance loan), Wells Fargo originated more than 15,000 FHA refinance transactions, worth more than $2.2 billion,.[24]  Wells Fargo originated another 6,300 in FHA new purchases, worth 1.1 billion, during this same time.

---

[21] https://www.hud.gov/sites/dfiles/Housing/documents/2019FHAAnnualReportMMIFund.pdf.

[22] https://www.hud.gov/sites/documents/FHA_SF_MARKETSHARE_2014Q2.PDF.

[23] https://www.wsj.com/articles/wells-fargo-to-offer-low-down-payment-mortgages-without-fha-backing-1464235261.

[24] https://www.hud.gov/program_offices/housing/rmra/oe/rpts/sfsnap/sfsnap.

65.     Extrapolating from the data above, Wells Fargo originated more than 100,000 FHA loans, worth between $18 billion and $20 billion, **just in the year 2013.**  Conservatively, Wells Fargo has originated more than 1 million FHA loans this millennium.

66.     At all times relevant hereto Wells Fargo failed to ensure that MIP payments were properly accounted for across this massive volume of borrower accounts.

67.     Consistent therewith, Wells Fargo advised Mr. Tuggle that Wells Fargo's over-assessment of MIP insurance payments was a "systemic problem."

68.     The end result is that Wells Fargo collects tens of thousands of dollars per month or more in MIP payments that it is not authorized to collect.  Wells Fargo collects these amounts in violation of its agreements with the borrower and in derogation of 24 CFR § 203.22, which together only authorize Wells Fargo to collect MIP to the extent <u>required</u> by HUD.

69.     Thousands of customers have been and continue to be impacted by this issue.

70.     Due to the fact that Wells Fargo Home Mortgage originates and/or services all of Wells Fargo's residential mortgage portfolio and is headquartered in Des Moines, Iowa, the state of Iowa is unique compared to other states where Wells Fargo's customers reside.

## <u>CLASS ACTION ALLEGATIONS</u>

71.     Mr. Tuggle's experience was substantially similar to that of all members of the Class who were negatively impacted by Wells Fargo's mishandling of its FHA residential mortgage accounts.

72.     Mr. Tuggle and members of the class continue to be harmed by Wells Fargo's actions, and seek injunctive and declaratory relief, as well as damages in their individual capacities.

73.     Mr. Tuggle requests the Court certify this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

74.     Mr. Tuggle brings this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2)

and (b)(3), on behalf of a nationwide Class under Iowa law defined as follows:

> All current or former borrowers who entered into a single-family
> home mortgage purchase or refinance transaction with Wells Fargo
> that was insured by the Federal Housing Administration during the
> time period January 1, 2001 until the present and who were
> overcharged for monthly mortgage insurance premiums (the
> "Class.")

Excluded from the Class are: (i) Defendants and their officers and directors, agents, employees,

affiliates, and subsidiaries; (ii) all Class members that timely and validly request exclusion from

the Classes; and (iii) the Judge presiding over this action.

75.     **Alternatively**, Mr. Tuggle brings this case as a class action pursuant to Fed. R. Civ.

P. 23(b)(3) on behalf of the following subclass:

> All current or former borrowers within the State of Mississippi who
> entered into a single-family home mortgage purchase or refinance
> transaction with Wells Fargo that was insured by the Federal
> Housing Administration during the time period January 1, 2001 until
> the present and who were overcharged for monthly mortgage
> insurance premiums (the "Alternative Mississippi Class.")

Excluded from the Alternative Mississippi Class are: (i) Defendants and their officers and

directors, agents, employees, affiliates, and subsidiaries; (ii) all Class members that timely and

validly request exclusion from the Classes; and (iii) the Judge presiding over this action.

76.     Further, as discovery unfolds, additional classes or modified classes might be

possible or necessary, perhaps delineated by State or loan type. However, because Wells Fargo's

violations, breaches, acts, omissions and/or failures impacted borrowers across the country and

were made to borrowers across all of Wells Fargo's FHA loan programs, a single nationwide class

is best-suited for this action and places Wells Fargo on notice of the broadest possible class that

Plaintiffs could move for, as contemplated by the Federal Rules' notice-pleading standard.

77.    **Numerosity:** Upon information and belief, the members of the Class number in at least the thousands. As a result, the Class is so numerous that joinder of all members in a single action is impracticable. The members of the Class should be readily identifiable from mortgage and other records of Wells Fargo. The disposition of these claims will provide substantial benefits to the Class.

78.    **Commonality and Predominance:** There is a well-defined community of interest and common questions of law and fact which predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which will generate common answers which are apt to drive the resolution of the litigation, do not vary between members of the Class. These common questions may be determined without reference to individual circumstances and will provide common answers. The following represent a non-exhaustive list of common questions:

> a. Whether Wells Fargo collected MIP payments from borrowers after FHA had canceled their MIP payment obligation;
>
> b. Whether Wells Fargo knowingly collected MIP payments that were not authorized by the Deed of Trust or other loan documents executed by the borrowers;
>
> c. Whether Wells Fargo was reckless and/or negligent in its oversight of FHA accounts, including but not limited to, its assessment of monthly MIP payments;
>
> d. Whether Wells Fargo lacked adequate internal controls and/or processes for determining which FHA loans in its portfolio had active MIP obligations owed to FHA;
>
> e. Whether Wells Fargo lacked adequate internal controls and/or processes for timely detecting and refunding MIP overpayments;
>
> e. Whether Wells Fargo concealed the fact of MIP overpayments from borrowers;

f. To what extent Wells Fargo either directly or indirectly profited from borrowers' overpayments of MIP;

g. Whether Wells Fargo's improper collection of unauthorized MIP payments violates applicable consumer protection statues, including but not limited to the Iowa Consumer Credit Code, which applies to acts, practices or conduct that occurs within the State of Iowa in the collection or enforcement of a transaction without regard to where the transactions was entered into, *see* Iowa Code Section 537.1101 *et seq.*, and

h. Whether, as a result of Wells Fargo's conduct, Mr. Tuggle and the Class are entitled to damages, restitution, injunctive relief, equitable relief and/or other relief, including but not limited to recovery of their attorneys' fees and costs, and, if so, the amount and nature of such relief.

79.    **Typicality:** Mr. Tuggle's claims are typical of the claims of the Class. Mr. Tuggle and all members of the Class were injured by the same wrongful practices in which Wells Fargo has engaged. Further, Mr. Tuggle and members of the Class seek relief based on the same legal theories. There may be differences in the amount of damages sustained by each member of the Class; however, Class-wide and individual damages can be determined readily. Individual damages issues will not bar Class certification.

80.    **Adequacy of Representation:** Mr. Tuggle will fairly and adequately protect and pursue the interests of the Class. Mr. Tuggle understands the nature of the claims herein, his role in the proceedings, and has and will vigorously represent the Class. Mr. Tuggle has retained Class counsel who are experienced in and qualified in prosecution of consumer protection class actions and other forms of complex litigation. Neither Mr. Tuggle nor his attorneys have interests which are contrary to or conflict with those of the Class.

81.    **Superiority and Manageability:** A class action is superior to all other available methods of adjudication of this lawsuit. Because individual litigation of the claims of Class

members is economically infeasible and judicially impracticable, the class action device is the only way to facilitate adjudication of Mr. Tuggle's and the Class' claims. Although the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each member resulting from Wells Fargo's wrongful conduct are not significant enough for experienced counsel to handle on an individual basis. Further, even assuming individual Class members could afford to pay counsel on an hourly basis, the damages sustained do not justify the expenditure, making the likelihood of individual claims being pursued by the Class members remote at best. Even then, the burden on the judicial system would be unjustifiable compared with the benefits available under the class action device. Individual members of the Class do not have significant interest in individually controlling the prosecution of separate actions and individualized litigation could result in varying, inconsistent or contradictory judgments. Mr. Tuggle knows of no reason that this litigation should not proceed as a class action.

82.     The nature of notice to the Class is contemplated to be by direct mail upon certification of the Class or, if such notice is not practicable, by best notice possible under the circumstances including, *inter alia*, email, publication in major newspapers, and maintenance of a website.

## TOLLING AND ESTOPPEL

83.     Mr. Tuggle's causes of action did not arise until he discovered that he had been injured by Wells Fargo's acts, practices or conduct upon receipt of the Notification Letter in July 2020.   The duration of his MIP payment obligation was determined by HUD/FHA and communicated to Wells Fargo; until he received the Notice Letter Mr. Tuggle had no way of knowing when his MIP was due to terminate, or that Wells Fargo had improperly assessed monthly MIP payments for 41 months.

84.    Any applicable statutes of limitations have been tolled by Wells Fargo's knowing and active concealment of the material facts regarding its MIP overcharges.  By holding Mr. Tuggle's funds for more than two years after discovering his overpayment, Wells Fargo deprived him of vital information essential to pursue his claims, without any fault or lack of diligence on the part of Mr. Tuggle and/or Class members.

85.    Wells Fargo was and is under a continuous duty to disclose to Mr. Tuggle and the members of the Class the true facts and circumstances surrounding Wells Fargo's MIP overcharges.   At all relevant times, and continuing to this day, Wells Fargo knowingly, affirmatively, and actively misrepresented and concealed the true character, quality and nature of these facts and circumstances.

86.    Based on the foregoing, Wells Fargo is estopped from relying on any statutes of limitation in defense of this action.

87.    Pursuant to the doctrines of Equitable Tolling, Equitable Estoppel, Fraudulent Concealment and the Discovery Rule, the period for bringing claims shall not be barred due to any statute of limitations or statute of repose. With respect to each and every cause of action asserted herein, Mr. Tuggle expressly pleads Equitable Tolling, Equitable Estoppel, Fraudulent Concealment and the Discovery Rule and their application thereto.

88.    All conditions precedent to the filing of this Complaint have been satisfied. This action has been filed prior to the expiration of any applicable statute of limitations or statute of repose.

**FIRST CAUSE OF ACTION**
**Fraud**
**(Brought on behalf of the Class, or, the Alternative Mississippi Class)**

89.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

90.    Wells Fargo agreed to charge MIP to Mr. Tuggle on a monthly basis, but only to the extent such premiums were payable to HUD/FHA.

91.    Mr. Tuggle relied on Wells Fargo to accurately and honestly transmit information regarding any MIP payments due on his account.

92.    Beginning in 2015, Wells Fargo was made aware, via monthly reports and other interfaces, that HUD/FHA were no longer assessing monthly MIP charges to Mr. Tuggle's account.

93.    Wells Fargo concealed this information from Mr. Tuggle, and further continued to collect unauthorized MIP payments from him for another 41 months.

94.    The fact that HUD/FHA no longer required MIP payments to Mr. Tuggle's account was material insofar as Mr. Tuggle had no other means of knowing that his MIP payment obligation had terminated.

95.    Wells Fargo stopped collecting MIP payments from Mr. Tuggle in or about June 2018.

96.    At this time Wells Fargo did not inform Mr. Tuggle that he was due a refund for the 41 months' worth of overpayments Wells Fargo had assessed to him from January 2015 to June 2018.

97.    Wells Fargo held the full amount of these overpayments until July 2020, earning interest on the overpayments and/or using the funds to directly or indirectly increase its base of operating capital.

98.    Wells Fargo concealed the overpayment from Mr. Tuggle for more than two years before attempting to pay him off with a purported "refund" check in July 2020.

99.    Wells Fargo's acts and omissions, including its failure to communicate that MIP payments had been canceled and its concealment of overpayments from the defrauded borrower, are or were part of a larger pattern of fraud whereby Wells Fargo continued assessing MIP payments against a borrower's account even after HUD/FHA had automatically canceled the payment obligation.  This allowed Wells Fargo to collect more in monthly payments than it would otherwise would have collected, thus earning extra interest and increasing its operating capital.

100.    Wells Fargo's actions were fraudulent and entitle Mr. Tuggle, and the members of the Class, all of whom are similarly situated, to damages for Wells Fargo's breach, including punitive damages to the extent permitted by law.

<u>**SECOND CAUSE OF ACTION**</u>
**Breach of Contract**
**(Brought on behalf of the Class, or, the Alternative Mississippi Class)**

101.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

102.    The "Deed of Trust" executed between Plaintiff, on the one hand, and Wells Fargo Bank, N.A., on the other hand, authorized Wells Fargo Bank, N.A. and/or its loan servicer, Wells Fargo Home Mortgage, to charge MIP to Plaintiff on a monthly basis, but only to the extent such premiums were payable to the Secretary of Housing and Urban Development [HUD].

103.    Beginning January 2015, HUD/FHA stopped requiring MIP payments on Mr. Tuggle's account.

104.    Wells Fargo continued to collect monthly MIP payments from Mr. Tuggle for another 41 months, until approximately June 2018. Each of these 41 payments were collected in breach of the Deed of Trust between Wells Fargo and Mr. Tuggle.

105.    In or about June 2018, Wells Fargo stopped collecting MIP payments.

106.    The Deed of Trust required Wells Fargo to promptly refund the 41 overpayments to Mr. Tuggle.

107.    Wells Fargo held these funds for more than 2 years before attempting to refund them to Mr. Tuggle.

108.    Wells Fargo's actions violated the Deed of Trust and entitle Mr. Tuggle, and the members of the Class, all of whom are similarly situated, to damages for Wells Fargo's breach.

### **THIRD CAUSE OF ACTION**
**Violations of the Iowa Consumer Credit Code, Chapter 537.1011 *et seq*.**
**(Brought on behalf of the Class, or, the Alternative Mississippi Class)**

109.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

110.    Wells Fargo Home Mortgage is responsible for servicing Wells Fargo's residential mortgage portfolio, including those loans insured by the FHA.

111.    Wells Fargo Home Mortgage has its headquarters in Des Moines, Iowa, which therefore has a special interest in regulating misconduct that occurs within its borders.

112.    Iowa Code Chapter 537.1201 confirms that the Iowa legislature intended for the provisions of the Iowa Consumer Code to apply to all acts, practices or conduct in the state of Iowa

pertaining to the collection or enforcement of a transaction, without regard to where it was entered into or modified.

113.    Iowa Code Chapter 537.7103 prohibits a debt collector from, *inter alia*, collecting interest or other charges, fees or expenses incidental to a principal obligation unless the interest or incidental charge, fee or expense is expressly authorized by the agreement creating the obligation and is legally chargeable to the debtor.

114.    Wells Fargo violated Chapter 537.7103 by collecting monthly MIP payments from Mr. Tuggle and others that were not expressly authorized by agreement and/or legally chargeable to them as borrowers under an FHA-insured loan.  *See* 24 CFR 203.22.

115.    Wells Fargo failed to maintain procedures reasonably expected to avoid the MIP overcharges at issue herein.

116.    Wells Fargo also violated Chapter 537.7103's ban on deceptive or misleading practices by failing to refund MIP payments to Mr. Tuggle and other class members promptly, and further by concealing the existence of the overpayment for months or years thereafter.

117.    Mr. Tuggle and other members of the class are entitled to recover all damages available under the Iowa Consumer Credit Code, including but not limited to, statutory damages awarded to each member of the class, as well as their costs and attorneys' fees incurred in pursuit of the claims asserted herein.

**FOURTH CAUSE OF ACTION**
**Violation of the Iowa Regulated Loan Act, Iowa Code Chapter 536.1 *et seq.***
**(Brought on behalf of the Class, or, the Alternative Mississippi Class)**

118.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

119.    Wells Fargo is a "regulated lender" subject to the provisions of Iowa Code Chapter 536.

120.    Pursuant to Iowa Code Chapter 536.14, which governs borrower payments, all regulated lenders are subject to the provisions of the Iowa Consumer Credit Code.  Thus, a violation of the Consumer Credit Code is also a violation of Chapter 536.14.

121.    Any charges that are received in excess of those permitted by Chapter 536 have the effect of voiding the contract of loan "as to interest and charges and the licensee has no right to collect or receive any interest or charges."  In addition, the lender "shall forfeit the right to collect the lesser of two thousand dollars of principal of the loan or the total amount of the principal of the loan." *See* Chapter 536.13(6).

122.    As set forth above, Wells Fargo has engaged in deceptive and misleading practices, in violation of Chapter 537.7103, by collecting charges or expenses not expressly authorized by agreement and legally chargeable to Mr. Tuggle and other members of the Class, and also by concealing those overpayments instead of promptly refunding them.

123.    Pursuant to Iowa Code Chapter 536.13(6), Wells Fargo no longer has the right to collect interest from Mr. Tuggle and the other members of the Class.  Under that same Chapter Wells Fargo has forfeited its right to collect the lesser of $2,000 or the total amount of outstanding principal on the loan.

**FIFTH CAUSE OF ACTION**
**Negligence**
**(Brought on behalf of the Class, or, the Alternative Mississippi Class)**

124.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

125.     Wells Fargo owed Mr. Tuggle and the other members of the Class a duty to exercise reasonable care in the assessment, remittance, and accounting for MIP payments ultimately payable to FHA.

126.     FHA provides multiple reports and other resources through which Wells Fargo is able to ascertain whether MIP is owed on a particular account, as well as whether any overpayments have been made.

127.     Wells Fargo failed to consult these reports and other resources in a timely fashion, resulting in overpayments of MIP by Mr. Tuggle and the other members of the Class.

128.      Wells Fargo thus failed to use reasonable care in its handling of Mr. Tuggle and the Class members' MIP payments.

129.     Wells Fargo also breached its duty of care by failing to timely notify Mr. Tuggle and the other Class members of the MIP overpayment.

130.     Mr. Tuggle and the Class members were damaged by Wells Fargo's breach of its duty of care insofar as they paid unwarranted MIP charges, and further lost the use of those funds during the period of overpayment.

### SIXTH CAUSE OF ACTION
**Conversion**
**(Brought on behalf of the Class, or, the Alternative Mississippi Class)**

131.     Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

132.     Wells Fargo collected MIP payments that Wells Fargo was not authorized to collect from Plaintiff and other members of the Class

133.     Wells Fargo held these overpayments for months or even years prior to refunding them to Plaintiffs.

24

134.    Wells Fargo is liable for all damages flowing from its conversion of funds belonging to Plaintiff and the Class members that were improperly assessed as MIP payments.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment
### (Brought on behalf of the Class, or, the Alternative Mississippi Class)

135.    Plaintiff realleges and incorporates the preceding allegations by reference as if set forth fully herein.

136.    Wells Fargo overcharged Mr. Tuggle and other members of the Class for MIP overpayments.

137.    Wells Fargo deposited the MIP overpayments in escrow or similar accounts that earned interest for Wells Fargo and otherwise increased the base of operating capital Wells Fargo uses to fund its other operations, directly or indirectly.

138.    Wells Fargo failed to promptly refund MIP overpayments to Plaintiff and the Class.

139.    Wells Fargo was unjustly enriched by any proceeds it earned on these MIP overpayments, whether in the form of interest or otherwise.  These amounts should be disgorged and returned to Mr. Tuggle and the other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Thomas E. Tuggle II and the other members of the Class respectfully request that the Court enter a Judgment against Defendants Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage, Inc. as follows:

A.    Certifying this case as a class action and appointing Mr. Tuggle and his counsel to represent the Class;

B.    Awarding Mr. Tuggle and the other members of the Class damages and all other relief available under the claims alleged, including punitive damages where appropriate;

C.      Enjoining Wells Fargo from collecting MIP payments from borrowers after the FHA has terminated the payment obligation;

D.      Awarding Mr. Tuggle and other members of the Class pre-judgment and post judgment interest as a result of the wrongs complained of herein;

E.      Requiring Defendants to disgorge the revenue earned through the MIP overpayments described herein;

F.      Awarding Plaintiffs and other members of the Class restitution;

G.      Awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and other costs of litigation; and

H.      Awarding such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 16, 2020

*/s/ Brian O. Marty*
SHINDLER, ANDERSON, GOPLERUD & WEESE, P.C.
J. Barton Goplerud
Brian O. Marty
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
T: 515-223-4567
F: 515-223-8887
goplerud@sagwlaw.com
marty@sagwlaw.com

PEIFFER WOLF CARR KANE & CONWAY
Joseph Peiffer (will seek admission *pro hac vice*)
Daniel Centner (will seek admission *pro hac vice*)
1519 Robert C. Blakes Sr. Dr.
New Orleans, Louisiana 70130
T: 504-605-2234
F: 504-608-1465
jpeiffer@peifferwolf.com
dcentner@peifferwolf.com

*Counsel for Plaintiff and the proposed class*

26